```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Brandon M. Mossbarger,              :

      Plaintiff,                   :

    v.                                :      Case No.  2:14-cv-1257

                                                       :      JUDGE JAMES L. GRAHAM
Commissioner of Social Security,           Magistrate Judge Kemp

      Defendant.                   :

                   REPORT AND RECOMMENDATION

                 I.   Introduction

Plaintiff, Brandon M. Mossbarger, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income.  Those applications were filed on March 14, 2011, and alleged that Plaintiff became disabled on September 20, 2010.

After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on February 26, 2013.  In a decision dated March 15, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on July 10, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on November 10, 2014.  Plaintiff filed his statement of specific errors on March 6, 2015, to which the Commissioner responded on June 10, 2015.  A reply brief was filed on June 28, 2015, and the case is now ready to decide.

        II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who was 29 years old at the time of the administrative hearing and who has his GED, testified as follows. His testimony appears at pages 44-67 of the administrative

record.

Plaintiff last worked at a packing plant, which is where he sustained an injury.  He worked for several months after the injury at a sedentary job but he was unable to do it successfully and was ultimately let go.  The injury involved his left foot.  Prior to that job, he had worked at a car dealership, doing some administrative tasks for the service department and photographing cars for sale.

Since being injured, Plaintiff has undergone physical therapy, ultrasound treatment, and been treated with a dorsal column stimulator, none of which helped.  He takes medication but it only eases his pain somewhat.  He cannot walk normally and must use a cane or other balancing aid.  The pain was constant, and the only thing which seemed to help was lying in bed with his foot elevated and then taking enough medication so he could sleep.  He was not able to wear regular shoes and he had fallen several times.

Plaintiff also testified that the pain in his foot radiated up his leg as far as his knee.  His foot had been discolored since the injury, but temperature changes in the foot came and went daily.  He was taking both Oxycodone and Ibuprofen for pain, and his medication made him drowsy and interfered with his concentration.  He was unable to do any household chores but could do a little grocery shopping using a scooter.

As far as physical activity is concerned, Plaintiff said he could stand for five or ten minutes and sit for a few hours, but after sitting he would need to lie down.  He could walk a block but it was exhausting.  Plaintiff said he could lift 15 or 20 pounds.  His injury had affected his social life and made him irritable.  He had attempted to get mental health treatment but was unable to afford it.  He was able to message family members on Facebook and watched television occasionally

### III.  The Medical Records

The medical records in this case are voluminous.  The Court will summarize them here as they relate to Plaintiff's statement of errors.

The file includes a number of documents submitted to the Ohio worker's compensation authorities.  The claims allowed by that agency included a crush injury and contusion of the left foot, mononeuritis of the lower leg, and a lateral plantar nerve injury.

Plaintiff had also asked for allowance of a psychological injury.  Dr. Hawkins examined him with respect to that request and concluded that Plaintiff was not clinically depressed.  (Tr. 230-38).  Dr. Richetta, who had also done a psychological evaluation of Plaintiff, responded to that letter on August 15, 2011, noting his disagreement and concluding that Plaintiff was suffering from major depressive disorder as a consequence of his industrial injury and that it precluded his return to work as a laborer.  Plaintiff's symptoms included sadness with tearful episodes, suicidal ideation, anger, irritable mood, reduced concentration, indecisiveness, reduced energy, and insomnia.  (Tr. 299-300).  Dr. Richetta's evaluation report (Tr. 525-31) indicated that Plaintiff presented as sullen and disgruntled, and that Plaintiff had not been helped by a psychiatric hospitalization in March of 2011 (which is documented at Tr. 799-803), and that Plaintiff reported tearful episodes daily.  He had been angry, depressed, and suicidal prior to the hospitalization.  His sleep was impaired by both pain and depression.  Plaintiff had not coped well with the change in lifestyle brought about by his physical injury.  Dr. Richetta diagnosed major depressive disorder which caused "clinically significant distress or impairment in social, occupational, or other important areas of functioning."  Dr. Richetta thought Plaintiff would benefit from

psychotherapy and medication.  An assessment note from Adena Physicians Practice Group dated April 7, 2011, also shows a diagnosis of major depressive disorder.  (Tr. 345).

Another psychological assessment was done in December, 2011, by Dr. Briggs.  Plaintiff reported anxiety and anger.  He was able to manage his own personal care and hygiene.  He did some socializing with a few friends.  Dr. Briggs observed that Plaintiff was "obviously anxious and distraught" and was dependent on his mother for his daily well-being.  He "presented visible evidence that he is experiencing emotion, mental and day to day functional difficulties."  Dr. Briggs diagnosed major depression of moderate severity as well as an anxiety disorder and an avoidant personality disorder and rated Plaintiff's GAF at 60.  His prognosis was fair, and he was impaired in his ability to understand, remember, and carry out instructions, to carry out tasks, and to respond appropriately to others in a work setting.  He was also not totally capable of functioning in a stressful work situation.  (Tr. 2379-88).

There are a large number of records from Hillsboro Urgent Care.  They generally reflect a diagnosis of reflex sympathetic dystrophy which was causing severe pain.  An independent medical examination done on June 16, 2011 by Dr. Steiman showed pain in the left foot, occasionally radiating to the knee, and increased by weight-bearing.  Plaintiff needed assistance to stand, change positions, walk, climb stairs, do housework, and shop.  After detailing the course of treatment, Dr. Steiman concluded that Plaintiff did not have Complex Regional Pain Syndrome (formerly known as reflex sympathetic dystrophy) of the left foot.  (Tr. 314-21).  Dr. Freeman, who was treating Plaintiff for his foot injury, apparently disagreed, reporting in an October 25, 2011 letter that Plaintiff was still having pain, was not helped by Vicodin, experienced worsening depression with Klonopin, had a

mild purplish discoloration of the left foot, and had no movement in his fourth and fifth toes. A dorsal column stimulator was recommended. (Tr. 703-04).

Dr. Manuel was another one of Plaintiff's treating physicians. There is a note dated May 11, 2011, in which Dr. Manuel reported that Plaintiff was restricted to sitting jobs only. (Tr. 771). That conclusion appears elsewhere in Dr. Manuel's notes. Dr. Manuel also made a number of comments to the effect that Plaintiff was to be off work until further evaluation. He completed a functional capacity assessment in August, 2012, on which he noted that Plaintiff had a poor prognosis, suffered from depression and anxiety, could walk only half a block, could sit only two hours before needing to change positions, could stand for only five minutes, could not sit, stand, and walk in combination for more than six hours, needed to change positions at will, would have to take frequent unscheduled work breaks, had to use a cane when walking, could not lift over ten pounds, and would miss more than four days of work per month. Dr. Manuel also said, however, that Plaintiff could tolerate the stress of a low-stress job. (Tr. 2474-78).

An independent medical examination took place on November 2, 2012. The examiner, Dr. Gula, reported that Plaintiff's symptoms included pain in the left foot, along with discoloration, and difficulty walking. He walked with an abnormal gait and could not toe and heel walk. His foot was numb from the third to the fifth toes and he had marked weakness of the left foot. He also exhibited difficulty standing from a seated position and sitting from a standing position. He walked with a cane at all times. Dr. Gula concluded that Plaintiff had a "20% whole person impairment." (Tr. 2451-56).

In addition to these records, there are evaluations done by state agency physicians. Dr. Tangeman concluded on June 23,

-5-

2011, that Plaintiff had no severe psychological impairment and Dr. Gahman said on June 28, 2011 that Plaintiff could do a limited range of light work with no more than four hours of standing and some postural limitations.  Dr. Bolz concurred with that assessment on December 16, 2011, and on February 3, 2012, Dr. Orosz stated that Plaintiff had some psychologically-based limitations in the areas of maintaining attention and concentration for extended periods, keeping a schedule, maintaining regular attendance, being punctual, working in proximity to others, interacting with the public and supervisors, responding to changes in the work setting, and handling work stress.  He thought Plaintiff would need a work environment with little change, with only superficial interaction with others, and without strict production quotas, pace, and standards.

IV.   The Vocational Testimony

Robert Brodzinsky was the vocational expert in this case. His testimony begins on page 67 of the administrative record.

Mr. Brodzinsky was asked to categorize Plaintiff's past work.  He said that one of the jobs which Plaintiff held at the car dealership was film photographer, which was a light, skilled position.  The others were car rental clerk, a semiskilled position usually performed at the light exertional level, and service writer, which was light and skilled.  Plaintiff performed these jobs at the medium level, however.

Mr. Brodzinsky was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could lift at the light exertional level but who was limited to standing no more than two hours per day.  The person could also push and pull occasionally as well as occasionally climb stairs and ramps, could stoop, kneel, crouch, and crawl frequently, could not climb ladders, ropes, or scaffolds, and could not be exposed to hazardous machinery or

unprotected heights. Further, he could do only simple, routine, repetitive tasks in a work environment where changes occurred only occasionally and where there was only occasional interaction with coworkers and the public. Mr. Brodzinsky said that such a person could not do Plaintiff's past work but could be employed as a production assembler, electronics worker, and small products assembler. He gave numbers for each job in the State and national economies. If the person were limited to sedentary work with the same restrictions, that person could work as a final assembler, a surveillance system monitor, or a film touchup inspector.

Finally, Mr. Brodzinsky testified that someone who was off task 20% of the time could not be competitively employed. The same would be true for someone who missed three days of work per month. The need to keep one leg elevated 18 inches off the floor would reduce the numbers of the jobs which he identified but would not eliminate them altogether.

## V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19-33 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. Next, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of September 20, 2010. Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including major depression, anxiety disorder, personality disorder, disorders of the left foot, and chronic pain disorder. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404,

Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level with certain restrictions.  He could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could frequently stoop, kneel, crouch, and crawl; could not be exposed to hazardous machinery or operational control of moving machinery; could not be exposed to unprotected heights; could only occasionally push or pull using his left leg; and was limited to the performance of simple, routine, repetitive tasks in a work environment where changes occurred on no more than an occasional basis and where there was no greater than occasional interaction with coworkers and the general public.

The ALJ next concluded that Plaintiff could not do his past relevant work.  However, he also determined that Plaintiff could do certain jobs identified by the vocational expert, including final assembler, surveillance system monitor, and monitor film inspector.  The ALJ further found that such jobs existed in significant numbers in the State and national economies (5,000 and 175,000, respectively).  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ committed legal error by failing to address the opinion of Dr. Richetta; (2) the hypothetical question posed to the vocational expert did not exactly reflect the residual functional capacity found by the ALJ; and (3) the ALJ erred in his assessment of the treating source opinion from Dr. Manuel. These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the

-8-

Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Richetta's Opinion

Plaintiff's first argument deals with Dr. Richetta's opinion. He asserts, briefly, that the ALJ erred by not explicitly considering Dr. Richetta's opinion, and that this failure violated 20 C.F.R. §404.1527(b) and (c). The Commissioner responds that the ALJ did not have to discuss each medical opinion explicitly, and then argues that any failure to do so was harmless because the ALJ essentially adopted Dr. Richetta's opinion. In reply, Plaintiff argues that Dr. Richetta's opinion is more restrictive than the residual functional capacity which the ALJ assigned to Plaintiff, so that

any error was not harmless.

While it is correct that an ALJ need not discuss each and every item of evidence in the record, at the same time, an ALJ is required to give consideration to all of the medical opinions in the file. See 20 C.F.R. §404.1527(b)("In determining whether you are disabled, we will always consider the medical opinions in your case record..."). When it appears that an ALJ completely failed to consider a medical opinion, remand can be appropriate. "'An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required.'" Williamson v. Comm'r of Social Security, 2013 WL 394572, *3 (S.D. Ohio Jan. 31, 2013), quoting Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995). Here, the complete absence of any mention of Dr. Richetta's evaluation report and the letter written rebutting Dr. Hawkins' report - which the ALJ discussed and gave some amount of weight to, see Tr. 28 - strongly suggests that the ALJ gave Dr. Richetta's views no weight whatsoever and totally failed to consider them. That is legal error. The question then becomes whether the error is harmless.

The Commissioner claims that there is no difference between Dr. Richetta's opinion and the mental residual functional capacity adopted by the ALJ. More specifically, the Commissioner characterizes Dr. Richetta as having expressed only two opinions: (1) Plaintiff is clinically depressed; and (2) Plaintiff cannot return to work as a laborer. Dr. Richetta did say the latter in his August 15, 2011 letter as well as in his report. While it is not entirely clear what he meant by that, one implication would be that, from a psychological standpoint, Plaintiff could not perform the mental requirements of unskilled work - a conclusion which the ALJ did not reach. In the more comprehensive evaluation report, Dr. Richetta said that Plaintiff was depressed every day, experienced psychomotor agitation on a daily basis, was fatigued every day, and had a diminished ability to think or

-10-

concentrate nearly every day. These symptoms caused distress or impairment in the areas of social and occupational functioning. The ALJ may have taken some of these matters into account, but there is simply no way to tell that he viewed Dr. Richetta's opinion as consistent with the RFC finding made since he never discussed the relationship between the two. Further, the ALJ refused to give much weight to the opinion of Dr. Orosz because he did not view it as consistent with the other evidence of record, but the limitations imposed by Dr. Orosz seem to track, in substantial part, the views of Dr. Richetta, and it is not clear how the ALJ would have analyzed Dr. Orosz's opinion had he compared it to Dr. Richetta's. Given these factors, the Court cannot consider the error to be harmless, and a remand is required so that the ALJ can follow the applicable regulation concerning the consideration of all of the pertinent medical opinions.

### B. The Hypothetical Question

The next statement of error is directed to the hypothetical question posed to the vocational expert. He contends that there is a distinction between what was asked to the expert about pushing and pulling (only occasional engaging in this activity generally) and what the ALJ found in his decision (limiting Plaintiff to occasional pushing and pulling involving the use of the left leg). Since they are different, Plaintiff contends that the ALJ was not entitled to rely on the expert's testimony about the jobs Plaintiff could perform.

The Commissioner disputes that there is any discrepancy between the limitation included in the hypothetical question and the limitation expressed by the ALJ in his RFC finding. The Court agrees; the limitation on occasional pushing and pulling generally encompassed a more specific restriction on doing those activities with the left leg. Given this conclusion, there is no need to address the Commissioner's alternative argument that the

ability to push and pull is not generally relevant to sedentary work, which is the level to which Plaintiff was restricted by the ALJ's residual functional capacity finding.

### C. Dr. Manuel's Opinion

Plaintiff's last argument takes issue with the ALJ's rejection of Dr. Manuel's opinion. He notes four different limitations stated in that opinion, relating to changing positions, taking unscheduled breaks, not being able to concentrate for long periods of time, and the need to miss more than four days of work per month, that were not directly addressed by the ALJ, and asserts that the ALJ's failure to weigh each of these limitations independently is a legal error requiring remand. He also claims that the reasons given by the ALJ for rejecting Dr. Manuel's opinion are not supported by the record.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation

so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The Court begins by looking at what the ALJ actually said about Dr. Manuel's opinion. The ALJ determined that it "generally lacked credibility." (Tr. 30). That was so, according to the ALJ, because (1) his conclusions about Plaintiff's ability to walk or stand differed from Plaintiff's statements of his ability in those areas; (2) his conclusion that Plaintiff could sit for only four hours in a work day was not supported by the record; (3) it was impossible to interpret Dr. Manuel's view about Plaintiff's lifting capacity; and (4) the form completed by Dr. Manuel was a "checkbox form." Consequently, the ALJ gave it "little weight." (Tr. 31).

This discussion of the only opinion from a long-term treating physician is, contrary to the Commissioner's argument, not adequate to satisfy the ALJ's regulatory obligation. The first reason proffered by the ALJ rests on only trivial differences between Plaintiff's statements and Dr. Manuel's opinion, and the statements related to a different time frame. The third reason is simply a statement about an ambiguity in the opinion, and given that Plaintiff was limited to sedentary work, it is not a material ambiguity. The fourth reason does not carry a significant amount of weight, since ALJ's often rely on opinions from state agency reviewers which are also expressed on "checkbox forms"; as the court stated in Coy v. Astrue, 2012 WL 5497850, *8 (N.D. Ohio Nov. 13, 2012), "[b]ecause such forms are routinely provided to treating physicians to aid in disability determinations, it makes little sense to allow ALJ's to categorically ignore the information requested." Although an ALJ may consider the form of the report and the reasons given as

-13-

factors in his assessment, see, e.g., Lee v. Comm'r of Social Security, 2013 WL 6116814 (N.D.Ohio Nov 20, 2013), where, as here, the file contains a vast quantity of treatment notes from the doctor who completed the form, it is questionable whether the ALJ can use the format of the opinion as a persuasive basis for rejecting it.

    That leaves, essentially, the statement that the restrictions on sitting are not supported by the record. That reason might support rejecting that particular restriction, but not rejecting all of the opinion, which contains many other limitations inconsistent with gainful employment. The ALJ never discussed these limitations. While in some cases the failure to address particular portions of a treating source opinion may be harmless error, here, the failure to do so prevents either the Plaintiff or the Court from understanding why those portions of the opinion were rejected, which is a violation of the articulation requirement set forth in §404.1527(c) as interpreted in Wilson, supra. This issue also supports Plaintiff's request for remand.

### VII. Recommended Decision

    Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### VIII. Procedure on Objections

    If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper

objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                              /s/ Terence P. Kemp
                                              United States Magistrate Judge